## HUTCHINSON v. TAMBASCO.

1. EVIDENCE—JUDICIAL NOTICE—AUTOMOBILES—CARBON MONOXIDE
   GAS.
       It is common knowledge among persons whose employment is
       closely connected with operations around automobiles in en-
       closed places such as garages that carbon monoxide gas is ex-
       pelled through the exhaust of a running motor and that even
       small portions of the gas mixed with air are poisonous and
       may cause a person who inhales such gas to collapse.

2. WORKMEN'S COMPENSATION—ACCIDENTAL INJURY—KNOWLEDGE OF
   FOREMAN—NOTICE OF INJURY.
       Knowledge of foreman who had worked on same car as plaintiff
       on a cold day in November in an enclosed building for car
       washing that plaintiff had collapsed after having worked near
       exhaust pipe of preceding car whose motor had been kept
       running held, sufficient to charge employer with notice of in-
       jury from carbon monoxide poisoning (2 Comp. Laws 1929,
       § 8434; Act No. 10, pt. 7, § 7, Pub. Acts 1912 [1st Ex. Sess.],
       as added by Act No. 61, Pub. Acts 1937).

3. SAME—CLAIM FOR COMPENSATION—NOTICE OF INJURY—REPORTS.
   Claim for workmen's compensation filed about eight months after injury was received was not barred where employer which had timely notice of the injury had not filed a report (2 Comp. Laws 1929, § 8434).

4. SAME—QUESTIONS REVIEWABLE—APPORTIONMENT OF AWARD UNDER OCCUPATIONAL DISEASE AMENDMENT. ·
   Defendants' claim that, if plaintiff contracted an occupational disease as he had alleged, it was an aggravation of a pre-existing condition and the department should have proportioned the award under the occupational disease amendment of the workmen's compensation act, not having been raised before the department nor alleged in the claim of appeal, is not considered (Act No. 10, pt. 7, §§ 7, 8, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937.

5. SAME—FINDING OF DEPARTMENT—CARBON MONOXIDE POISONING—EVIDENCE.
   Finding of department of labor and industry that car washer's paralysis was caused by carbon monoxide gas to which he was exposed as a recurrent condition in his employment was supported by competent testimony (Act No. 10, pt. 7, § 2, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937).

Appeal from Department of Labor and Industry. Submitted April 11, 1944. (Docket No. 73, Calendar No. 42,469.) Decided October 11, 1944.

Clarence Hutchinson presented his claim for compensation against S. Tambasco, doing business as Lafayette Auto Wash, employer, and State Accident·Fund, insurer, for compensation for occupational disease. Award to plaintiff. Defendants appeal. Affirmed.

*Dann & Atlas,* for plaintiff.

*Harry F. Briggs* (*Henry A. Compeau* and *Rowland E. Giller,* of counsel), for defendants.

REID, J. This is an appeal in the nature of certiorari from an award of the department of labor and industry.

On November 14, 1941, plaintiff filed a notice and application for adjustment of claim with the department, alleging that an accident, the cause of his physical condition, happened on the — day of March, 1941 (not specifying on what day in March it occurred); that the accident happened as follows: plaintiff was overcome by excessive and unusual accumulation of carbon monoxide gas. The injury is carbon monoxide poisoning resulting in paralysis.

Defendants on November 25, 1941, filed their answer to the statement of claim, setting forth the following: first, that plaintiff suffered no injury in their employment; second, that he suffered no disability as a result of any accidental personal injury arising out of and in the course of their employment; third, that he did not make claim for compensation within the statutory period; fourth, that they had no notice or knowledge of an accidental personal injury arising out of and in the course of any employment within the statutory period.

The amended notice and application alleged the matter as "accident and occupational disease" and was filed January 14, 1942, to which an amended answer was filed January 17, 1942.

The finding of the deputy commissioner was that plaintiff's average weekly wage was $21, that plaintiff had not sustained an accident nor suffered an occupational disease and was not entitled to receive any compensation.

On review by the department, May 6, 1943, finding was made in accordance with plaintiff's claim that on March 14, 1941, while doing his regular work in the employment of defendant, plaintiff became dis-

abled as the result of occupational disease. They reversed the deputy's award and awarded plaintiff compensation for total disability, $18 per week beginning March 14, 1941.

In the instant case plaintiff's work was wiping off the windows and exteriors of the automobiles that were proceeding along the line. Other employees in preceding operations prepared the cars for plaintiff's finishing operation. The last car that plaintiff worked on was immediately behind a car, the motor of which was running, half racing, with smoke 'coming out of the exhaust pipe. The owner of that car didn't want the motor stopped during the washing process. As plaintiff cleaned off the whole side of the car down to the front, the smoke from the preceding car's exhaust continued to come out into his face. It was cold that day, the windows were closed and the doors were closed except when they let a car out. Plaintiff continued to work in such a position on the last car that his face was in front of the exhaust and in the path of the exhaust fumes for about five minutes. After that, as he testified, he felt "pretty dog-gone bad * * * awful funny about the head and everything * * * dizzy, dizzy." He went back to the barrel, wrung out his chamois, and there fell exhausted over the barrel. His foreman on the job, Charles McCray, and others came along and carried him out into the air and placed him on a bench in front of the building. After McCray finished up another car he told a customer to take plaintiff home but the man took plaintiff to Receiving hospital, where he remained 15 days. He was then taken to Marine hospital where he remained until August 31, 1941, when he was taken home. He has not been able to do any work since. It was 75 days after he returned home from the hospital that he filed his claim.

Plaintiff claims that knowledge on the part of the foreman of his condition is equal to notice and that he is excused from filing his claim during his illness in the hospital, that under 2 Comp. Laws 1929, § 8431 (Stat. Ann. § 17.165), the statute of limitations does not run against him until the report of the injury shall have been filed by the defendant with the department.

A controlling item is the knowledge of the foreman and the question whether such knowledge of the foreman constitutes notice to the company so that the employee need not give any other notice.

Charles McCray, the foreman, testified as follows:

"*Q.* You remember the day when he collapsed at work?

"*A.* Sure.

"*Q.* These cars move on a conveyor, don't they?

"*A.* No, they push them down; they come in and we give them only just a little push and they go down.

"*Q.* And as soon as it gets in there, some men start working on it right there?

"*A.* Yes.

"*Q.* And then they go a little bit farther and some other men work on them?

"*A.* Yes, men to do the body washes and men to chamois.

"*Q.* So that 10 men aren't working on a car at one time?

"*A.* Oh, no.

"*Q.* There is about 2 and 2?

"*A.* When one car gets done another car takes that place and then the body washers do that one then it gets to the chamoising and then they get started on that and it just keeps going and they chamois the body off and it keeps right on going.

"*Q.* These cars are close together?

"*A.* Yes, bumper to bumper.

"*Q.* So that the exhaust from one car in front would be right there at the front of the next car, it would be right there?

"*A.* Yes, it would be right next to the next one.

"*Q.* If you were bending over and wiping around the hood and fenders there you would get the exhaust right in your face?

"*A.* If you was wiping the back end by the exhaust pipe, I suppose you would get it.

"*Q.* You would if the exhaust of the car ahead is coming right at you, isn't it?

"*A.* Well, yes, if of course they are linked together; most naturally they would be that way.

"*Q.* Were you working with Hutchinson on a car before he got sick?

"*A.* Sure, working, I am on one side and he is on the other.

"*Q.* You do the wiping out there?

"*A.* Yes, I wipe this side and he wipes on that side.

"*Q.* Is that all you do on the job is wipe or do you go from car to car and supervise?

"*A.* I am from car and to car and help them.

"*Q.* So that you aren't always wiping a car?

"*A.* No, I chamois the car and collect the money."

Plaintiff also testified that the foreman worked on the other side of the car that plaintiff worked on, and the inference is fair that the foreman knew about the escaping of carbon monoxide gas from the exhaust of the car ahead as described by plaintiff. The foreman further testified:

"*Q.* McCray, as a matter of fact you didn't notice him until he collapsed on the barrel, isn't that right?

"*A.* No, I did not.

"*Q.* Isn't that when you first noticed him?

"*A.* When I first noticed him I had a tag and was walking in the place and hanging it up and

when I turned around this way he was laying on the barrel; I stepped back and seen him.

"Q. Had you watched him walk from the car he was working on to the barrel?

"A. I didn't see him; I didn't watch him walk away; I didn't know it; when I went there he was on there, because I was on this side.

"Q. And you helped carry him out?

"A. I did. *    *    *

"Q. Did you ask a customer to take him to the hospital?

"A. . The customer offered; he said, 'I will take him home.' And I sent one of the boys with him; one of the boys working in the gang.

"Q. Didn't you want him taken to the hospital?

"A. No, he wanted to go home; and I said—this fellow says, 'I will take him home,' I offered to pay him; he says, 'Give me the wash,' I says, 'You can have it,' he says, 'I will take him.' When they get out, they claim he was too sick to take home and they took him to the hospital.

"Q. He was sick when he fell over the barrel?

"A. He must have been. *    *    *

"Q. *    *    * Hutchinson said he wanted to go home, did he say that he wasn't feeling good, that he wanted to go home, or what?

"A. He didn't tell me nothing; he just said he wanted to go home; there was a doctor there at the time, he said, 'This fellow is sick and he needs to go home or to the hospital.'

"Q. You said that there was a doctor there at the time; there was a doctor in there at the time?

"A. Yes.

"Q. And this doctor said that this man either had to go home or to the hospital?

"A. When we picked him up we saw he was sick. He examined him and he said, 'His heart is beating all right.' When we sat him on the bench his heart was beating all right. He said, 'This man needs to go home or to the hospital.' Although when they

got him out they took him to the hospital. I told him to take him home. They thought he was too sick and took him to the hospital. They found out he was too sick; just how sick he was I don't know, because I ain't a doctor. * * * The fellows said this fellow (plaintiff) is sick; I said, 'Sure he is sick.' He must have been sick. 'Pick him up and take him out.' "

Some cars were washed with the engine running, and some back-fired when they got wet.

Plaintiff also testified that the foreman ordered him taken home.

Plaintiff's witness, Dr. Owen, testified, reciting facts shown by testimony and his direct deductions therefrom:

"First, he had been well; second, he was in some heavy fumes, and in those fumes there (are) a lot of gases such as carbon monoxide and other incompletely combusted petroleum gases which make a person sick to their stomach, and which give people headaches. * * * If a person has carbon monoxide poisoning their blood is deficient in oxygen, because the carbon monoxide attaches itself to the hemoglobin, so that the oxidation is hindered very greatly, and with that process very frequently small blood vessels do rupture * * * so I believe there could be a relationship between an exposure to the fumes indoors and the resultant paralysis that he now has."

We take notice of the fact that it is common knowledge among persons whose employment is closely connected with operations around automobiles in enclosed places such as garages that carbon monoxide gas is expelled through the exhaust of a running motor and even small portions of the gas mixed with air are poisonous and may cause a person who inhales such gas to collapse.

Defendants cite *Gumtow* v. *Kalamazoo Motor Express,* 266 Mich. 16; *Littleton* v. *Railway Co.,* 276 Mich. 41; *Maki* v. *S. J. Groves & Sons,* 279 Mich. 644; *Berg* v. *Hemlock River Mining Co.,* 287 Mich. 697. Since the cause for claim occurred in each of those four cited cases, the occupational disease amendment to the workmen's compensation law was enacted, being Act No. 61, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485–1 *et seq.,* Stat. Ann. 1940 Cum. Supp. § 17.220 *et seq.*), which took effect October 29, 1937. Part 7, § 2, subd. 22, then defined carbon monoxide poisoning as occupational disease. In the *Berg Case, supra,* the opinion stresses want of notice of an accident within the required period and the word accident is italicized in the opinion, which recites at p. 700:

"It is urged as a defense that defendant had no notice nor knowledge within the statutory limitation of plaintiff's having suffered an *accident.* There is ample testimony disclosing that plaintiff's sickness and his inability to continue his work were promptly called to the attention of defendant."

On p. 699 the opinion recites:

"Plaintiff claims that getting wet caused rheumatism, that he could not get out of bed the next day and he sent notice to the company's doctor who attended plaintiff * * * that a couple of weeks after the alleged accident his superintendent called on plaintiff and he told the superintendent about getting wet."

The *Berg Case* does not sustain the position of defendants as to sufficiency of notice in this occupational disease case.

The case of *Vestal* v. *Therminsul Corp.,* 291 Mich. 64, while not discussed in the briefs, should be considered on the question of notice. In that case a

light-colored gas was observed coming out of the
cupola door, and two of defendant's employees, Slee-
man and Webster, who had been putting coke and
slag into the cupola, were overcome by gas to such
an extent that immediate medical attention was nec-
essary. Plaintiff's decedent assisted in attempts to
resuscitate them. He went to his home nearby and
got some whisky. A short time after that his wife
found him in a stooped position by the sidewalk.
He appeared to be faint. The doctor called about an
hour afterwards and found him practically uncon-
scious. While one doctor was working on the two
other men defendant's superintendent received a re-
port that Vestal "had also been taken sick and was
at home." The superintendent immediately went to
the Vestal home and was told by Vestal that he was
"sick to his stomach." Defendant's night super-
intendent also testified as to the gassing of Sleeman
and Webster and that Vestal told him the next morn-
ing that he had been taken ill the same night the
other two were gassed and that he "had to have
help to get home" because "he was taken ill on his
way to the house." In that case the department,
after citing *Clifton* v. *Chrysler Corporation,* 287
Mich. 87, held that the testimony "relative to notice
or knowledge was not sufficient to sustain plaintiff's
action." On appeal we held that "knowledge of
Vestal's illness following so closely and so im-
mediately connected with knowledge of the escaping
carbon monoxide gas and its effect on others in the
same room was sufficient 'notice or knowledge of
the injury' to satisfy the requirement of the stat-
ute," and vacated the order of the department.

Section 10 of part 7, the occupational disease
amendment, provides:

"The requirements as to notice as to occupational
disease and death resulting therefrom and the re-
quirements as to the bringing of proceedings for

compensation for disability or death resulting from such occupational disease shall be the same as required in section fifteen of part two of this act, except that the notice shall be given to the employer within one hundred twenty days after the disablement.''

''Want of  *  *  *  notice shall not be a bar *  *  * if it be shown that the employer had notice or knowledge of the injury.'' 2 Comp. Laws 1929, § 8434 (Stat. Ann. § 17.168). *Purdy* v. *City of Sault Ste. Marie,* 188 Mich. 573 (Ann. Cas. 1917D, 881); *Burke* v. *Michigan Stamping Co.,* 223 Mich. 495.

The knowledge on the part of the foreman is sufficient under this section to charge the defendants with notice. The company not having filed a report to the department, the claim is not barred.

Defendants claim that if the plaintiff contracted an occupational disease as he alleges, it was an aggravation of a pre-existing condition and the department should have proportioned the award under Act No. 10, pt. 7, § 8, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 61, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485-8, Stat. Ann. 1943 Cum. Supp. § 17.227). This objection was not raised before the department nor alleged in the reasons and grounds for appeal to this Court, and will not now be considered. See *Kolbas* v. *American Boston Mining Co.,* 275 Mich. 616.

There was competent testimony to show plaintiff's paralysis was caused by the carbon monoxide gas to which he was exposed in his employment on the occasion in question, which was also a recurrent condition of his employment, and to furnish a basis for the department's finding. The award is affirmed, with costs to the plaintiff.

NORTH, C. J., and STARR, WIEST, BUTZEL, BUSHNELL, SHARPE, and BOYLES, JJ., concurred.